# United States District Court
# For The District of Minnesota

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>RAYMOND DAMON SMITH,<br>BOP Prisoner #20827-112<br>Defendant. | ) | **Case: 0:01-cr-00267-JMR-FLN**<br>**MEMORANDUM IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 USC §2255** |

## STATEMENT OF THE CASE

On September 11, 2001, Raymond Damon Smith was named in a two count indictment issuing from the United States District Court for the District of Minnesota. Count one of the indictment charged Mr. Smith with Conspiracy to Distribute and to Possess with Intent to Distribute Cocaine Base and Cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 18 U.S.C. § 3237. Count two of the indictment charged Mr. Smith with Attempt to Possess with Intent to Distribute Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 18 U.S.C. §§ 2 and 3237. (Doc. 1, Indictment).

On January 18, 2002, Barry Voss was substituted as counsel for Mr. Smith. (Doc. 33, Consent to and Substitution of Counsel). After the substitution of Barry Voss, who was privately retained, Mr. Smith began making *pro se* filings.

On July 16, 2002, the court issued an order notifying Mr. Smith that *pro se* filings by individuals who are represented by counsel need not be considered, and that the Court would not consider further pro se motions. (Doc. 50, Order). Many *pro se* filings followed.

On October 1, 2002, Mr. Smith's jury trial began. (Doc. 75, Minutes). Trial lasted five full days. On October 10, 2002, the jury returned a verdict of guilty against Mr. Smith on both counts of the indictment. (Doc. 85, Verdict). Following the jury's verdict, Mr. Smith expressed to the District Court his dissatisfaction with the representation of his retained attorney, Barry Voss, stating specifically that he and Voss had significant disagreements about the evidence that would be presented in defense of Mr. Smith. (Tr. of Verdict, pgs. 5-6). Mr. Smith stated clearly on the record that there were several witnesses he wanted Voss to subpoena for his defense, but Voss refused. (Tr. of Verdict, pgs. 5-6). Mr. Smith also expressed his dissatisfaction with his inability to reach Voss prior to trial, as well as the fact that Voss refused to consider any of Mr. Smith's suggestions regarding possible lines of defense. (Tr. of Verdict, pgs. 5-6). Voss then spoke up and admitted that the two had the disagreements, but cited trial strategy as the reason for his decisions to not subpoena the defense witnesses, and to not pursue the potential defenses pointed out to him by his client. (Transcript of Verdict, pg. 6). Voss then

immediately requested that he be relieved as counsel prior to sentencing. (Transcript of Verdict, pgs. 6-7).

Prior to sentencing, many additional *pro se* filings were made. On December 5, 2002, Paul Applebaum was appointed to replace Barry Voss as counsel for the Defendant. (Doc. 99, Order). Following additional *pro se* filings, Paul Applebaum was permitted to withdraw as counsel pursuant to Mr. Smith's motion to compel withdrawal. (Doc. 103, Motion) (Doc. 107, Order).

On February 11, 2003, the undersigned counsel was appointed to represent Mr. Smith. (Doc. 111, Order). Additional *pro se* filings were made.

On July 11, 2003, the court held a sentencing hearing at which the Motion For New Trial was also argued. (Doc. 127, Minutes). The court took Mr. Smith's Motion For New Trial under advisement and proceeded to sentence him to 400 months incarceration on counts 1 and 2, with the sentences to run concurrently. (Doc. 128, Sentencing Judgment).

## <u>STATEMENT OF THE FACTS</u>

This case involved the transportation of drugs, specifically cocaine base and cocaine hydrochloride, from California to Minnesota, by a man named Norman Darnel Toney. Toney allegedly transported drugs or caused drugs to be

transported from California to Minnesota from October 1, 1995, through January 31, 1998. Toney used couriers to transport the drugs for him.

On June 1, 1997, two of Toney's couriers were stopped in Colorado in possession of 1.929 kilograms of cocaine base.

On August 25, 1999, Toney was arrested in connection with his drug trafficking activities, and immediately began cooperating. Toney's source for drugs in Los Angeles was allegedly a man he knew only as "Cap", who allegedly lived at 2315 Stanford in Los Angeles. The government alleged that "Cap" was Raymond Damon Smith, the Appellant.

On September 11, 2001, Mr. Smith was indicted on the instant charges. On September 17, 2001, Mr. Smith was arrested in California, and was eventually brought to the District of Minnesota for trial.

## DISCUSSION OF LAW

### I. THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY COUNSEL'S TOTAL FAILURE TO INVESTIGATE THE FACTS OF THE CASE, TO OBJECT TO THE GOVERNMENT'S REPEATED USE OF IMPERMISSIBLE LEADING QUESTIONS DURING THE DIRECT EXAMINATION OF ITS OWN WITNESSES AND TO OTHERWISE PREPARE FOR TRIAL.

The Sixth Amendment guarantees a criminal defendant the fundamental right to counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). The Supreme

Court has recognized that "the right to counsel is the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449 (1970) (emphasis added). The right includes the right to have an advocate for one's cause. *Avery v. Alabama*, 308 U.S. 444, 446, 60 S.Ct. 321, 322 (1940). Counsel must "subject the prosecution's case to meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 2947 (1984). We focus on whether counsel committed "unprofessional errors [that] so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman*, 477 U.S. at 375. As the Supreme Court stated in *Kimmelman*:

> "[c]ounsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial process . . . Counsel's competence, however, is presumed . . . , and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy . . . [C]ounsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary."
> *Id.* at 384 (internal quotes omitted).

The Eighth Circuit generally gives great deference to an attorney's informed strategic choices, but at the same time closely scrutinizes an attorney's preparatory activities. *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993). Although there is generally a certain amount of deference to the strategic choices of counsel,

deference is not required if counsel was unprepared for trial. *Chambers v. Armontrout*, 907 F.2d 825, 835 (8th Cir.), *cert. denied*, 498 U.S. 950 (1990). As the Supreme Court stated in *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000), "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable."

In this case the Defendant's counsel apparently did no investigation at all despite the Defendant providing leads to pursue. The Eleventh Circuit Court of Appeals has previously stated that "case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991); *see also Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) ("[C]ase law rejects the notion that a strategic decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."). The Eighth Circuit has weighed in on the issue and stated that in terms of strategic decisions, "if limiting the investigation was not reasonable, then neither was the subsequent strategic choice." *Antwine v. Delo*, 54 F.3d 1357, 1367 (8th Cir. 1995); *see Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir.), *cert. denied*, 112 S.Ct. 431 (1991) (Before an attorney can make a reasonable strategic choice against pursuing a certain line of investigation, the

attorney must obtain the facts needed to make the decision); *see also Cooley v. Nix*, 738 F.2d 345, 347 (8th Cir. 1984) (*quoting Strickland v. Washington*, *infra*, and holding that an attorney's strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation). Whether the limits counsel placed on his investigation represent a reasonable exercise of professional judgment must be considered in light of the totality of the circumstances. *Strickland v. Washington*, 466 U.S. 668, 691, 105 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Otay v. Grammar*, 859 F.2d 575, 578 (8th Cir. 1988); *see also Walker v. Solem*, 687 F.2d 1235, 1238-39 (8th Cir. 1982), *cert. denied*, 460 U.S. 1091 (1983). The Eighth Circuit has previously found ineffective assistance of counsel where trial counsel admittedly did not know enough about certain evidence to make a reasoned decision not to use it. *Henderson v. Sargent*, 926 F.2d 706, 712 (8th Cir. 1991).

The seriousness of the offense is a factor to be considered in the overall assessment of counsel's performance. *Pickens v. Lockhart*, 714 F.2d 1455, 1460 n. 4 (8th Cir. 1983); *see e.g. Wiggins v. Smith*, 123 S.Ct. 2527; 156 L.Ed.2d 471 (June 26, 2003) (High Court found ineffective assistance of counsel where the Defendant's attorneys completely failed to conduct an investigation into the

mitigating circumstances weighing against application of the death penalty). Raymond Smith was charged and convicted for an incredibly serious offense. The seriousness is reflected by the 400 month sentence he received. It was also a very complex case in that it allegedly involved many conspirators and a nationwide drug trafficking scheme. Such a case is unquestionably deserving of a thorough investigation by defense counsel. *Id.* Where counsel fails to conduct practically the entire investigation of a case, and such failure is due to a lack of preparation, that failure is unreasonable and unprofessional, and renders the adversarial testing process unreliable. *Wade v. Armontrout*, 798 F.2d 304, 307 (8th Cir. 1986). Furthermore, the reasons for counsel's unprepared ness that resulted in the lack of investigation are irrelevant. *Id.* at 307 n. 2.

There are essentially two prongs to an ineffective assistance of counsel claim. The first is that the performance of trial counsel must be deficient—i.e. there are unprofessional errors; and the second is prejudice. *Strickland v. Washington, supra*; *Lockhart v. Fretwell,* 506 U.S. 364, 369 (1993). The Court in *Kimmelman v. Morrison* summed up the requirements to produce a successful ineffective assistance of counsel claim. The Court stated that:

> "[I]n order to prevail, the defendant must show both that counsel's representation fell below and objective standard of reasonableness . . . and that there exists a reasonable probability that, but for counsel's

> unprofessional errors, the result of the proceeding would have been different."
> 477 U.S. at 375.

However, it is important to note that the analysis *is not* strictly an outcome-based analysis. As the court in *Lockhart v. Fretwell* stated:

> "counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."
> 506 U.S. at 369.

To show that his attorney's deficient performance prejudiced him, a defendant need not show that he could not have been convicted. *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993). Instead, he need only undermine this court's confidence in the trial's outcome. *Id.*; *Alexander v. Armontrout*, 985 F.2d 976, 978 (8th Cir. 1993).

The detriment to the Defendant caused by defense counsel's performance should be addressed in light of the extent to which the United States' case was allowed to go unchallenged because counsel failed to properly investigate the case. In *United States v. Cuffie*, 80 F3d 514 (D.C. Cir. 1996), the Court of Appeals evaluated the "materiality" of evidence withheld from the defense in violation of the *Brady v. Maryland*, 1373 U.S. 83 (1963), rule of disclosure. Although the case

involves a disclosure violation, it is also relevant to an analysis of prejudice in an ineffective assistance of counsel claim. The same analysis and standard is used for determining the "materiality" of undisclosed exculpatory evidence and "prejudice" in ineffective assistance of counsel claims. In *United States v. Bagley*, 473 U.S. 667, 682 (1985), the test to determine the materiality of impeachment evidence was based upon the test for prejudice in *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The test and its meaning were developed further in *Kyles v. Whitley*, 514 U.S. 419,115 S.Ct. 1555 (1995):

> "Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal [whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant]. * * * The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"
>
> *Id.* 115 S.Ct. at 1565-1566 (citations omitted); *see also Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland*.").

Thus, the analysis of materiality in *Brady* cases is on the same level as the assessment of prejudice in an ineffective assistance of counsel claim.

As the Supreme Court has indicated, the test is not a sufficiency of the evidence test. *See Kyles v. Whitley*, 115 S.Ct. at 1566. As the Court of Appeals explained in *United States v. Smith*, 77 F.3d 511, 316 U.S. App. D.C. 199 (D.C. Cir. 1996):

> "Indeed, a sufficiency-of-the-evidence test would require appellate courts to usurp the function of the jury, for judges would be forced to *guess*, based on a cold record, how the jury might have weighed the remaining evidence, standing alone, in a hypothetical error free trial. Because such an inquiry is inherently unreliable, Kyles rightly focuses attention instead on the potential impact the undisclosed evidence might have had on the fairness of the proceedings.[1] Thus, the amount of additional evidence indicating guilt is not dispositive of our inquiry. Instead, we must decide whether the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict."
> 77 F.3d at 515.

The Supreme Court has historically made a particularly strong point of honoring the jury's fact-finding function in assessing the prejudicial impact of

[1] Likewise, when appellate courts consider whether trial error is harmless, the Supreme Court has instructed us to refrain from analyzing the overall weight of the evidence, and instead look to the potential affect [sic] the error might have had on the jury. *See O'Neal v. McAninch*, 115 S.Ct. 992, 994-995, 130 L.Ed.2d 947 (1995) (The Court ruled that the proper measure of harmlessness is whether the error "had substantial and injurious effect or influence in determining the jury's verdict," *not* whether the record evidence is sufficient absent the error to warrant a guilty verdict.).

constitutional errors. *See e.g. Sullivan v. Louisiana*, 508 U.S. 275, 279-281 (1993). This self-imposed limitation is particularly important in attempting to assess the prejudice resulting from evidence not presented. Reliance on the weight of the evidence against Mr. Smith, as challenged by some cross examination by Mr. Voss would be misplaced. The strength of the Government's case is not the focus of inquiry. "[O]ur focus is on the 'potential impact that the undisclosed evidence might have had on the fairness of the proceedings rather than on the overall strength of the government's case." *United States v. Smith*, 77 F.3d at 515; *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996).

When impeachment evidence is not presented to the jury, it is: ". . . not the ways defense counsel was able to impeach [the witness], but to the ways in which the witness' testimony was allowed to stand unchallenged." *United States v. Smith*, 77 F.3d at 515; *United States v. Cuffie*, 80 F.3d at 517; *see also United States v. O'Connor*, 64 F.3d 355, 359 (8th Cir. 1995). Raymond Smith has been deprived of a specific right which is fundamental to a fair trial: the right to present his evidence and argue his defense to the jury. The assistance of counsel is guaranteed to facilitate these fundamental rights. When, as here, counsel functions to severely impair these rights, the defendant has suffered the kind of prejudice that warrants a new trial. *Lockhart v. Fretwell*, 506 U.S. at 370, 372.

The focus of inquiry in this case is Counsel's failure to investigate the case, and allowing the prosecution's case to go unchallenged. Counsel's failure to object to the prosecution's impermissible use of leading questions, and his failure to file a motion in limine pertaining to important evidence admitted against Mr. Smith is also very troubling, and neither can be explained away as a strategic decision.

**C. DISCUSSION**

**1. Counsel's Failure To Hire An Investigator and reliance upon cross examination as the strategy of defense was not a reasonable strategic decision.**

As the Court in *Kimmelman v. Morrison* stated: "[C]ounsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." 477 U.S. at 384. A California court has stated that:

> "[i]n order to render reasonably competent assistance, a criminal defense attorney should investigate carefully the possible grounds for seeking the suppression of incriminating evidence, *explore the factual bases for defenses that may be available to the defendant, and otherwise pursue diligently those leads indicating the existence of evidence favorable to the defense*."
> *In re Neely*, 864 P.2d 464, 485 (Cal. 1993) (emphasis supplied).

The *Neely* Court continued by stating that:

> "trial counsel's *failure to interview witnesses* known by him to possess potentially exculpatory information, and

> his *exclusive reliance upon information provided to him by police investigators* (assertedly because he had a 'good rapport' with them), *without hiring his own investigator*, deprived his client of reasonably competent representation."
> *Id.* at 485 (emphasis supplied).

In terms of counsel's performance in the case, it does not appear that counsel investigated the alternative facts, found nothing, and then adopted a strategy of not presenting the defense. Counsel apparently not only abandoned his responsibility to properly advocate on the Defendant's behalf, he totally abdicated his responsibility. As one Alaska Court found in a situation where counsel failed to properly assemble and defend a case:

> ". . . [the Defendant's] trial attorney did not make a tactical decision to not use . . . information [in his client's favor], but 'completely failed to perceive the worth of a veritable gold mine of information. No reasonably competent attorney would have overlooked the value of this evidence. Counsel did not strategize. He committed error.' Judge Woodward concluded that counsel's failure to utilize the extensive information which potentially cast doubt on the credibility of Simpson's alleged victims raised a reasonable doubt concerning whether a jury would have convicted Simpson."
> S*tate of Alaska v. Simpson*, 946 P.2d 890, 893 (Ct. App. 1997).

"Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Henderson v. Sargent*, 926 F.2d 706, 711 (8th Cir. 1991); *Foster v.*

*Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993); *Nazarenus v. United States*, 69 F.3d 1391, 1394 (8th Cir. 1995). "Ordinarily a reasonably competent attorney will conduct an in-depth investigation of the case..." *Hawkman v. Parrat*, 661 F.2d 1161, 1168 (8th Cir. 1981); *Morrow v. Parrat*, 574 F.2d 411, 413 (8th Cir. 1978). *Neal v. Acevedo*, 114 F.3d 803, 806 (8th Cir. 1997); *see also Otey v. Grammar*, 859 F.2d 575, 578 (8th Cir. 1988) (burden on petitioner to show what additional evidence counsel could have discovered that would have helped defense).

Mr. Smith consistently tried to be involved in his defense and to get counsel to investigate. At the time of the verdict, he clearly pointed out that his attorney was difficult to reach for two months, and that he had both ideas on presentation of the case and subpoenas for witnesses. If the case were not a complicated maze of documents and computer phone records then Mr. Voss could possibly claim that reasonable investigation could be dispensed with. However, this is a complicated web of witness statements, phone tolls, cross-country trips, motel records, and alleged drug deals. It was unreasonable to fail to hire an investigator, and in point of fact to apparently fail to do any investigation at all!

In fact, Mr. Voss's own words reveal a lot about how much investigation he conducted. Directing his comments to Mr. Smith in a colloquy regarding Mr. Smith not testifying, Mr. Voss stated before the Court that: " . . .I told you that if

we tried this case it would be my attempt to try your case, that is put your defense in through my cross examination of the government's witnesses, so that you would not have to testify, correct?" (Tr. at 798). Of course when you conduct no independent investigation of the facts you are left with no alternative other than cross examination. When Mr. Smith complained about counsel after the verdict was read, Mr. Voss told the Court that: "Mr. Smith is correct. We have had differences regarding trial strategy and the subpoenaing of witnesses, and the presentation of evidence I take as trial strategy. And that's my position." (Tr. of Verdict at 7; Appendix at 33). Mr. Voss is incorrect. Mr. Voss's disagreement was not about the presentation of evidence or the issuance of subpoenas to witnesses. Had Mr. Voss bothered to investigate and discovered he could not secure evidence sufficient to support presentation of a particular theory to the jury, or the subpoena of a particular witness to testify, he could claim a strategic decision was made about witnesses and evidence. In reality, Mr. Voss never ***bothered*** to investigate and gather evidence or witnesses and, therefore, the differences were not about strategic decisions concerning the presentation of evidence and subpoenaing of witnesses. The differences between Mr. Smith and Mr. Voss were whether Mr. Voss would even ***bother*** to even explore evidence and possible witnesses. There is a big difference. The difference is between the

ineffective assistance of counsel that happened in this case, and a strategic decision. This was not a strategic decision.

Although sometimes an in-depth investigation is not required, that clearly was not the case here. Mr. Voss's own failure in his offer of proof, cross-examination of Officer Kenneth Aragon is a prime example of his failures. (Tr. at 560-563). Mr. Smith pointed out to Mr. Voss that there were possible skeletons in Officer Aragon's closet concerning investigations and alleged police misconduct. (Tr. at 561). Had Mr. Voss conducted an investigation of the CRASH Unit from Newton Station, he would either have found the needed evidence to challenge the officer's statements on cross examination, or he would have found the allegations baseless, which would have taken away the need for his fishing expedition at trial. The examination of the Officer is characteristic of how Mr. Voss pursued the entire case. Cross examination was used as a substitute for investigation.

Even the Assistant U.S. Attorney could do no more than prop up Mr. Voss's performance in terms of his reliance upon the discovery provided by the U.S. Attorney. Mr. Walbran stated: " . . . In the first instance, the government has made very extensive discovery in this case, because it conducted a very in-depth investigation. As reflected by the number of witnesses and the number of exhibits. Mr. Voss has always been attentive to that material and has had frequent

discussions with me concerning the case, and his cross examination showed that he found the weak spots in each of my witnesses, of which there certainly were some." It would be nice if cases were this simple—if only a defense lawyer could rely upon the benevolent assistance of the Government in providing discovery, and extensive discovery at that, and simply use their evidence. However, relying on Government discovery in such a complex case where the Defendant points to facts that need investigating is not enough. The number of witnesses and exhibits reflects all the more upon the need for investigation, and the lack of witnesses and exhibits for the defense is very telling. Once again, cross examination without investigation is wholly inadequate.

This is a case where defense counsel clearly accepted the Government evidence. No investigator was hired and no independent investigation conducted. Possibly it would also be reasonable to dispense with an investigator if Mr. Voss had investigated the case on his own.[2] However, Mr. Voss sent his entire file to current counsel and there is nothing in there that even represents an independent investigation on the part of Mr. Voss. There is no investigation report, a scant 4 pages of attorney notes, and no independently obtained documents other than a couple of letters for a bond hearing. All that is in the file are those documents

[2] Incidentally, counsel acting as an investigator is also not a very intelligent move, as it can then place counsel in the position of being a necessary witness, which can put counsel in conflict with his ethical duties and the common rule that lawyers should not be witnesses in their own cases.

either provided by the Government, or attorney generated motions, correspondence, etc..

Mr. Smith should be livid about counsel's complete abdication of his responsibility to investigate, and also over his self serving comments at trial that Mr. Smith concurred with relying on cross examination and that it was a strategic decision. (Tr. at 798). Mr. Smith received 400 months in jail, or 33 years and 4 months. (Doc. 128). He is now 34 years old. If he receives his good time credits, he will serve about 29 years. He will be 63 years old when he is eligible to be released. Thus, Mr. Smith has lost most of his life as a result of this case. Such serious consequences deserve serious and careful investigation. That did not occur here. Mr. Voss tries hard to put his decision to rely on cross examination in the context of keeping Mr. Smith off the stand, but his comments were nothing more than an attempt to create a smoke screen—a cover behind which to hide. (Tr. at 798). There is no connection between the failure to investigate and keeping Mr. Smith off the stand. His rationale makes no sense whatsoever. Had Mr. Voss conducted investigation that revealed evidence with tremendous impeachment value then it is unclear why the Defendant would be forced to take the stand as a result. Securing the IA Division file on the Newton Station CRASH unit and any allegations of misconduct leveled against officers at the unit would have been great

impeachment evidence with no connection to Mr. Smith testifying or not. Securing independent evidence on witnesses such as Kelese Stallings would have had nothing to do with Mr. Smith testifying. Mr. Voss did not do his job—it is that plain and simple.

**2. Counsel Failed To Subpoena Documents From The Internal Affairs Division Of The Los Angeles Police Department.**

One important piece of evidence admitted against the Defendant was a previous arrest record. (Tr. at 508-519). Officers had alleged that Mr. Smith had been caught with drugs at the 2315 Stanford Avenue address. The officers involved in the arrest were part of the Community Resources Against Street Hoodlums ("CRASH") unit from the Newton Division of the LAPD. The CRASH unit at Newton Street Station has not been at the vortex of a controversy quite like that which consumed the CRASH unit at the Rampart Division. (Tr. at 561). However, defense counsel was been urged to investigate corruption on the part of the officers involved in the Defendant's prior arrest. It is clear from the transcript that Defense Counsel knew there was an issue regarding the CRASH unit. However, Defense Counsel did nothing prior to trial on this matter, and was reduced to trying to put together cross examination on the spot at trial with the Defendant feeding questions to Counsel. (Tr. 562-563). In fact, Counsel's approach was so haphazard that at one point the Court believed Mr. Voss was done

his questioning and dismissed the witness—in fact, counsel broke away from questioning to have Mr. Smith feed him another question. (Tr. at 562-563).

It was alleged that officers of the Newton CRASH were being investigated by the Internal Affairs Group ("IA") of the LAPD based on a complaint that the Defendant's own brother had filed. (Tr. at 563). Defense Counsel conducted no investigation into the allegation. If the allegation were true then it provides motive for the Officer to be biased against Mr. Smith. Instead, Defense Counsel merely asked Officer Kenneth Aragon about the investigation, and Counsel had no choice but to accept Aragon's word as the Gospel truth when the line of questioning did not pan out. (Tr. At 560-564).

A prior drug arrest is a very important piece of evidence. Counsel cannot simply accept the word of those presenting the evidence. Counsel was required by proper diligence and due process to subpoena all Internal Affairs Division ("IAD") documents and all witnesses that would have reflected upon the credibility of the witnesses. Counsel did not do that. The Eighth Circuit has previously held that:

> "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of penalty. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities."
> *Eldridge v. Atkins*, 665 F.2d 228 (8th Cir. 1981) (quoting American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution

Function and the Defense function § 4.1 (Approved Draft 1971)), *cert. denied*, 456 U.S. 910 (1982).

Fishing around for answers during an offer of proof is not prompt. No charges were filed in the case where it was alleged the Defendant had discarded a packet of drugs. This was allegedly due to a mix up, but Defense Counsel never investigated what really happened. The officers had every reason to have it in for the Defendant and his family given that the Defendant's brother filed a theft complaint with the IAD about Officer Aragon himself. (Tr. at 563). It is highly suspect that the Defendant was never charged in the case, even though LAPD Criminalist Marie Chance testified that the packet did contain almost a perfect kilo of cocaine? (Tr. at 524). In addition, the Defendant had a gun in his possession with the drugs. It is amazing no charges were filed based on the gun itself. Was that because there was something fishy about the case, or was it a just a mistake? Why wasn't the Defendant's probation revoked for this incident, as he was on probation and engaging in community service? This is something that should have been explored further. Could the probation officer's files have revealed exculpatory evidence placing the Defendant at a location other than the location of a drug deal? Could the files have made telephone calls involving drug deals impossible? The same would go for the time log that was required to be completed each time Raymond participated in community service. Was it significant that the

Defendant's fingerprints were never said to be on the packet? We do not know because Defense Counsel never checked. Instead, the evidence flooded in without challenge, once again accepted as the Gospel truth.

Police officers are protected by the mantle of respect and honor the minute they take the stand. Everyone would like to believe they live up to the respected place in which society places them, but that is not the job of the defense lawyer. For our system to work, defense counsel must be vigorous in efforts to challenge the case presented. Investigation is crucial to gain any valuable impeachment evidence and any other evidence that would reflect upon the veracity of the officers and the accuracy of the evidence offered. Not only could investigation have turned up valuable impeachment evidence, it could have assisted in keeping out the evidence of the prior arrest. The Defendant clearly was prejudiced by Mr. Voss's failure to subpoena IAD records and check into the drug arrest. Instead of effective representation, the Defendant was left with unchallenged admission of the testimony of the officers. With that the unchallenged testimony in the record, Mr. Smith became a violent drug dealer instead of an accused defendant.

**3. Counsel Failed To Properly Investigate Alternative Theories In The Case.**

Mr. Smith was entitled to present a defense that someone else committed the crime. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (dealing with the exclusion of testimony that someone other than the Defendant committed the crime under the state hearsay rule, and finding that few rights are more sacred than the right to present witnesses and evidence in your own defense); *See Also United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996) (supporting the conclusion that a defendant has a right to present the defense that someone else committed the crime). One of the key witnesses in the case was Norman Darnell Toney. Toney allegedly ran drugs from Los Angeles, California, to the Minneapolis, Minnesota area. Toney admitted on the stand that he organized and oversaw a large drug trafficking network between California and Minnesota. (Tr. at 607-756). During the investigation, which was confirmed by his testimony, Toney identified a whole list of people, who he alleged had secured drugs for him from the Defendant. He also identified the location of the original drug deals as 2315 Stanford Avenue. (Tr. at 621-622), which was property the Defendant contends was leased by Kelese Stallings.

So, who is Kelese Stallings? Kelese Stallings was presented at trial as being an airline stewardess. She was presented as being innocent. She was presented as

being on the fringes of this whole matter, but not involved. That way she confirmed many factual details while avoiding the tainting of her character by actually having her involved in the conspiracy itself. However, what we did not see is the presentation of information the Defendant wanted Defense Counsel to explore. The Defendant knew that Kelese Stallings had worked as a stripper at the First Kings bar in LA. Mr. Smith alleged that the First Kings was well known in the neighborhood as a location for its drug activity. Toney had been to LA. The 2315 Stanford address was the source of many calls to Norman Toney during the course of the conspiracy. (*See* Tr. at 678-686). Was the phone really Kelese Stallings's phone? Who opened the account? Why did Defense Counsel not subpoena Kelese Stallings's payroll records from the First Kings and other workplaces to see whether she could have made those calls? Why did Defense Counsel not look back beyond the alleged conspiracy start date to see if calls were made from that location to Toney during a period in which Raymond Smith was incarcerated? These are all questions the Defendant wanted examined—Defense Counsel did nothing. Kelese Stallings could well have known Norman Toney from his trips to LA—we will never know because apparently Defense Counsel did not investigate Ms. Stallings or even talk to her outside the Courtroom. Ms. Stallings

went on the stand, testified, and stepped down with her reputation as an angel in tact. Once again the Government witness was taken at face value.

Counsel should have subpoenaed any possible documentation concerning drug activity at the First Kings, Ms. Stallings past criminal record, personnel records from the First Kings, witnesses who knew Ms. Stallings as a stripper at the bar, LAPD investigation records, and any other documentation that could be secured. Counsel should once again have hired an investigator in the case to question owners of the First King, employees from when she danced there, etc.. The possibility she was involved in the crime and in framing Mr. Smith should have been pursued. Counsel did nothing.

Another alleged drug connection for Norman Toney's cohorts was a Mexican national, who fled to Mexico. (Tr. at 617-618). Counsel should have examined this as Toney's possible "true" supplier, and his fleeing to Mexico as a ruse. Was the Mexican still here? Where did he go? We will never know because no investigation was conducted. Given that Toney received calls from a phone owned by one Fabian Chavez, it is possible that the number was that of the Mexican connection. Raymond Damon Smith is not Hispanic—why use a Hispanic name to take out a phony cell phone account when you are an African-

American? Would it not be obvious it is not his true identity? This should have been obvious to past counsel.

Who was Fabian Chavez? The Defendant contended he was not Fabian Chavez and so Defense Counsel should have pursued this issue. Once again, no investigator was on the job, and Defense Counsel did nothing to follow this lead. Once again the chance to present an alternative theory that someone else committed this crime and Raymond Smith was being set up was frittered away.

A three-way connection with Toney and the Mexican Chavez as the major players, with Kelese Stallings as the window dressing, or with Toney, the Mexican Chavez and Stallings as equal culprits, was also a viable defense theory. Unfortunately, counsel could not make a reasonable decision not to pursue that strategy because he never investigated anything to begin with. As Stallings was the person dating Raymond Smith, it would be easy to pin the entire thing on Mr. Smith. She would know his name was Damon, and could have had him or someone else open a cell phone account in the name Damon Stallings. Stallings could have known Raymond Smith's grandmother lived close to 2315 Stanford Avenue. Stallings would know his comings and goings and what kind of life he was leading. This could have been the cold and calculating creation of a fall guy.

Why did witnesses, who originally had no clue who CAP was change their stories? Was there an organized effort to make Raymond Smith the man? Although Roger Douglas, the owner of 2315 Stanford, indicated that Raymond Smith paid the rent despite the rental receipts being made out to Kelese Stallings, the same owner gave a statement that indicated he never felt comfortable around Raymond Smith—a statement that Mr. Smith noticed for the first time, accidentally, at counsel table during trial. Mr. Smith was never given the chance to see the statement before trial, or to assist in the challenge of this witness, or to give background on how they knew each other, from where they knew each other, and how good or bad their relationship was? The possibility that Mr. Smith was the one conveying the money to the Landlord, but not the true tenant was never investigated or explored. Roger Douglas was presented as a neutral witness with no ties to the conspiracy, and once again a Government witness was allowed to slip through unscathed. The witness obviously was not a fan of Mr. Smith, and yet that was never even brought up in cross examination. That being said he had no motivation to provide helpful testimony. Instead, he was allowed, unopposed, to put closure on the issue of who leased the home at 2315 Stanford.

What about witnesses who identified “Cap” as Raymond Smith? Nadine Wade indicated in a statement to Michael Leonard that she had made six trips to

Los Angeles and had met with “Cap” on each occasion. She also claimed that Lawrence Wade went with her on occasion to Los Angeles. In a statement given to law enforcement in Colorado on June 1, 1997, Lawrence Wade said that he and Nadine Wade left money in their vehicle, a 1993 Mercury Topaz, and then left the vehicle for an hour. (Doc. 123, Supplemental Request To Compel Production). On June 11, 1997, Lawrence Wade reiterated that he was told to leave the car for one hour when the drugs were to be delivered. (Doc. 118, Declaration: Evidence For A New Trial). This is the same method used to deliver the money to Nadine Wade in Minneapolis. (Doc. 118, Declaration: Evidence For New Trial). Lawrence Wade did not testify at trial. He was not called by the prosecution, and Defense Counsel proved to once again be asleep at the wheel when he failed to call Lawrence Wade—in fact, Defense Counsel did not call a single soul to the stand or offer a single exhibit in evidence. Wade’s statements directly contradict testimony implicating Raymond Smith.

Dropping money and drugs into parked vehicles left by couriers was characteristic of the entire operation—even Norman Toney did not walk right up to Lawrence Wade and hand him money. That couriers indicated they met CAP should have raised concerns on the part of counsel. It should have put him on reasonable notice to dig deeper. For instance, money for one Los Angeles trip was

surreptitiously placed in the back seat of a vehicle Nadine Wade drove to Toney's home. Alarm bells should have gone off when three years after Lawrence Wade was arrested, Nadine Wade starts stating that she met "Cap" on each trip to California and that he gave her drugs. Clearly, Lawrence Wade had a greater propensity to be truthful because he was making his statement while still in initial law enforcement custody, and law enforcement authorities were openly holding charges in abeyance pending cooperation—Lawrence Wade would not be prosecuted if he cooperated fully. So why lie when you know so much benefit rides on cooperation? And yet counsel did nothing to investigate and reasonably formulate a strategy to address eyewitness identifications. Instead, Defense Counsel simply allowed the identifications to occur.

As the prosecutor himself admitted, there were: ". . . weak spots in each of my witnesses." (Tr. of Verdict at 10). None of those weaknesses was delved into before trial. Defense Counsel simply cross examined the witnesses. Other than exposing a weakness, Defense Counsel could accomplish little without proper investigation of the facts. Stories constructed from a fabric of lies can be impeached with truthful contradictory evidence. However, impeachment requires evidence and evidence is only gathered through investigation. Investigation is something previous counsel did not do.

**4. Counsel Withheld Crucial Statements From The Defendant, Which Caused The Defendant To Be Unable To Effectively Exercise His Right To Confront The Charges Against Him.**

The Defendant has a right to be present during his trial. *Snyder v. Massachusetts*, 291 U.S. 97 (1934). The reason for this due process right is that the Defendant is afforded a reasonable opportunity to defend against the charges. *Id.* The Defendant also has a fundamental right to participate in his own defense. *United States v. Shepherd*, 284 F.3d 965 (8th Cir. 2002) (assuming without contradiction that the Defendant has a constitutional right to participation in his trial); *United States v. Durham*, 287 F.3d 1297, 1308 (11th Cir. 2002) ("One of Durham's rights that was affected by the error is the right to be present at trial and to participate in his own defense."). The Eighth Circuit has stated that:

> ". . . the confrontation clause contemplates the active participation of the accused at all stages of the trial, including the face-to-face meeting with the witness at trial or, at the minimum, in a deposition allowing the accused to face the witness, *assist his counsel, and participate in the questioning through his counsel*."
> *United States v. Benefield*, 593 F.2d 815, 822 (8th Cir. 1979) (emphasis supplied).

The Defendant's right to participate actively in his own defense is protected because ". . . active assistance at trial may be key to an attorney's effective representation of his interests." *United States v. Durham*, 287 F.3d at 1309, *citing United States v. Novaton*, 271 F.2d 968, 1000 (11th Cir. 2001).

Mr. Voss admitted that he had withheld statements from the Defendant. In fact, there was a concerted effort on the part of Mr. Voss, the prosecutor and prior Defense Counsel, Glen Bruder, to keep the statements from the Defendant. Mr. Bruder thought the Government demand that the statements not be revealed to Mr. Smith was not reasonable, as jail phones are monitored and no harm could come to the witnesses. Despite this, Mr. Bruder only prepared a memorandum summarizing testimony against Mr. Smith, and that memorandum glossed over Lawrence Wade's role, who was an exculpatory witness, who was conspicuously absent as a Government witness at trial, who the Defense never called, and whose statement the Defendant only saw after trial!! Even though the demand to keep the statements secret was deemed unreasonable by Bruder, both counsel withheld the statements. Those statements were only provided to the Defendant after trial when they were of no use to him in contributing to his effective representation. Talk about closing the barn door after the horse is out. In this case the horse was in the next county by the time Mr. Smith got to the barn door!

There can be no doubt that the Defendant's acquisition of the statements would lead to the very "effective" representation that the Eleventh Circuit discusses. Present counsel did not have the advantage of trying the case, and until the transcripts arrived had no idea what really happened at trial. Current counsel

was really in the position of a defense attorney who is handling the case before trial. During representation the Defendant has contributed to each theory developed and prepped for investigation, and has helped counsel sift through a quagmire of telephone tolls, statements and other evidence. Without the Defendant, current counsel would have been completely lost. The Defendant is a smart man, but prior counsel never tapped into that intelligence—Mr. Smith was never called upon to assist his defense. As in the Eleventh Circuit case of *United States v. Durham*, 287 F.3d 1297 (11th Cir. 2002), the Government should be required to show that the Defendant's defense was not harmed by the concealment of witness statements by defense counsel, as this goes beyond mere ineffective assistance of counsel to a denial of the Defendant's constitutional right to participate in his defense, which is much the same and in line with the right to confront witnesses.

That defense counsel withheld these statements from the Defendant was an outrage, and effectively denied the Defendant the ability to participate in his defense at trial, a right the Eleventh Circuit has so adamantly insisted is *key* to effective representation of the Defendant. Although the Government will not doubt argue that the Defendant was not prejudiced by the withholding of statements, such an argument is disingenuous. As the Eleventh Circuit has pointed out:

> ". . . When addressing possible prejudice after this type of error has occurred, it is not sufficient for the government to point out that the defendant was represented by an attorney looking out for his interests."
> *United States v. Durham*, 287 F.3d at 1308.

Additionally, the Eleventh Circuit pointed out that:

> "Nor it sufficient for the government to argue that the defendant cannot name any outcome-determinative issues or arguments that would have been raised had he been able to participate at trial. Not only does such an argument impermissibly transfer the burden of proof back to the defendant, but it also would eviscerate the right in all cases where there is strong proof of guilt."
> *Id.*

The same rationale applies here. Although these cases apply to situations where the Defendant is not present in the courtroom for a crucial part of the trial, the same rationale should apply to ineffective assistance claims where defense counsel completely eliminates the Defendant's right to participate effectively in his defense. Prime reasons for the Defendant's *pro se* filings was that he feared counsel was not doing his job, and also did not trust counsel. These were valid concerns considering that since trial the witness statements have popped up out of nowhere, and the Defendant was left out in the cold in formulating his defense.

**5. Although The Court Properly Asked the Defendant Whether He Wished To Testify, The Defendant's Waiver Of His Right To Testify Was Based Upon His Counsel's Failure To Prepare Him And Not Upon A Voluntary, Knowing And Intelligent Waiver Of His Right To Testify.**

A Defendant has a constitutional right to testify in his own defense. *Rock v. Arkansas*, 483 U.S. 44, 44-45 (1987); . A Defendant can waive the right to testify, but such "[w]aivers of constitutional rights not only must be voluntary but must be knowing, *intelligent acts* done with *sufficient awareness* of the relevant circumstances and likely *consequences*." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970).

Mr. Smith stated he did not wish to testify. (Tr. at 800). The Defendant has shown his counsel was ineffective in investigating the case and in formulating strategy that led up to the Defendant's ineffective waiver. Mr. Voss admitted differences with the Defendant in subpoenaing witnesses and presenting evidence, but chalked it up to trial strategy. (Tr. Verdict at 7). However, Mr. Voss's trial strategy was based on a failure to properly investigate the case, which is ineffective assistance of counsel. Mr. Voss lacked information needed to form strategy. Thus, his strategy, which gave rise to his advice to the Defendant not to testify was not an informed strategy. Mr. Voss was also difficult, if not impossible to reach for 2 months prior to trial. (Tr. Verdict at 6). Although Mr. Voss took difference with many of the Defendant's claims, he did not specifically contest the Defendant's

claim that he could not reach him for two months. (Tr. Verdict at 7). In fact, Mr. Voss admitted the Defendant tried to reach him on numerous occasions. (Tr. Verdict at 7). Due to counsel's ineffective assistance and lack of availability prior to trial Mr. Smith's waiver was not a knowing waiver, it was not an intelligent waiver, and it was not a voluntary waiver.

**6. Counsel Failed To File A Motion In Limine Regarding The Government's Admission Of Large Quantities Of Narcotics Into Evidence, Even Though A Motion In Limine Was Well Warranted.**

The failure of counsel to file a motion in limine regarding highly damaging evidence can constitute ineffective assistance of counsel. *See Thomas v. United States*, 951 F.2d 902, 904-05 (8th Cir. 1991) (per curiam). Nothing tied Mr. Smith to the large quantities of narcotics that were admitted as evidence against him at trial. Despite the fact that Attorney Voss had been informed by his client that his fingerprints would not be found on any of that evidence, and despite the fact that no other evidence connected Mr. Smith to those drugs, former counsel did not seek a motion in limine to keep the drugs out of the trial. This failure on the part of former counsel was inexcusable, and resulted in significant prejudice to Mr. Smith's defense.

**7. Counsel Failed To Object To The Highly Prejudicial Leading Nature Of Nearly Every Question The Prosecutor Asked On Direct Examination Of His Own Witnesses.**

Counsel's failure to object to the prosecutor's use of leading questions on direct examination can constitute ineffective assistance of counsel and a due process violation. *See Tanner v. United States*, 401 F.2d 281, 284 (8th Cir. 1968). This is especially true when there is no legitimate strategic reason for defense counsel to withhold an objection. *Id.* The impermissible use of leading questions permeated the government's case in chief, and unquestionably tainted the trial in favor of the government. Counsel wanted to provide the specific instances of leading questions, but Counsel has no idea where to start—the prosecution led witnesses on virtually every page of transcript. *See* Transcript. These leading questions were not merely on preliminary matters such as a witnesses name, and were not merely designed to assist in developing the witnesses testimony, as is permitted by Rule 611 (c) of the Federal Rules of Evidence.

These inexcusable leading questions were even more damaging to Mr. Smith's defense because of the fact that the evidence against him was fundamentally weak. Mr. Voss's failure to object to the prosecutor's repeated inappropriate use of leading questions on direct examination of the prosecution's own witnesses constituted ineffective assistance of counsel, and violated Mr. Smith's due process and fair trial rights.

Prevailing professional norms in Minnesota do not require or support an objection to each and every leading question. Some leading questions are so innocuous that an objection may not be strategically wise, and could be seen as an attempt to obstruct presentation of testimony. However, an attorney in Minnesota would be expected to object to a continuous string of damaging leading questions that run from the start of trial to the end. At one point Mr. Walbran leads Mussette Wade through a series of questions to diffuse a damaging statement she made to the Police. Keep in mind that Ms. Wade is Mr. Walbran's witness. The following interaction occurred:

> "Q. Did you ever, ah, let's talk about your visits to Cap's houses. There were the two of them. The one on Stanford, and the one on Sixth Avenue South; is that correct?
> A. Yes.
> Q. Being as fair as possible, thinking carefully, how many visits did you make there to obtain cocaine and crack cocaine from the Defendant?
> A. About fifteen times.
> Q. About fifteen times?
> A. Um hmm.
> Q. When you were at the house did you ever see firearms?
> A. No.
> Q. When you were interviewed initially by Agent Mike Leonard, now retired, and later by I believe Agent Sebesta, ah, there were times that you stated that you would go to Los Angeles and you would park in the same place, and you would walk away from the car.
> A. Yes.
> Q. Is it true that you parked in the same place?
> A. No.
> Q. What was, what was going on there, why would you say that?
> A. Umm, I didn't, I didn't know what to say, I didn't know—I really hadn't thought about it. Umm—

Q. You didn't give, you didn't tell us about Cap right away, did you?
A. No.
Q. It took you quite a while?
A. Yes.
Q. Why did you hide that?
A. Umm, I just, I don't know, I thought you guys were only after Norman Toney. Pretty much. I didn't think he was that important.
Q. Once we confronted you with evidence, you timely told the truth about that?
A. Yes."
(Tr. at 229-231).

Finally, after allowing the prosecutor to completely diffuse her statement, thereby essentially destroying its impeachment value, Mr. Voss leaps to his feet to state: "I object as leading Your Honor, and suggestive." (Tr. at 229) Judge Rosenbaum sustained the objection. (Tr. at 229). This type of interaction between the prosecution and witnesses, and either the non appearance or late appearance of Mr. Voss's objections permeate the transcript from page one to page 792 when the Government rested its case. For example, Mr. Walbran suggested to witnesses that trips were "drug runs" a total of twenty five (25) times throughout the transcript and through his questions led the witness to affirmatively confirm they were drug runs. (Tr. at 177, 185, 187, 188, 211, 216, 225, 226, 281, 291, 299, 300, 301, 303, 304, 334, 644, 650, 651, 656, 657, 665, 667, 682, 685).

Additionally, some of the most damning testimony came in the form of the prosecutor leading witnesses to positively identify the Defendant as Cap. Juwanda

Morris failed to identify Cap on direct examination. (Tr. at 276). This failure to identify Cap occurred despite the fact that Ms. Morris had a sexual relationship with Cap. (Tr. at 290). You would think that Ms. Morris would remember who she was having sex with?! And yet the prosecutor tried to press her to identify Cap by asking: "[y]ou're gonna tell us you don't recognize him?" (Tr. at 276). This was met with an objection, which was sustained. (Tr. at 276). However, not to be outdone, Mr. Walbran came back after a recess (Tr. at 331) and leads Ms. Morris to a successful identification of Cap, as follows:

> "Q. And you described him much as you've already described him in your testimony; isn't that correct?
> A. Yes.
> Q. Now, he has changed, isn't that correct? He has changed his appearance; isn't that right?
> A. Yes.
> Q. He's put on weight?
> A. Yes.
> Q. He's cut his hair shorter?
> A. Yes.
> Q. Um hmm. Thank you."
> (Tr. at 337-338).

This leading went completely unchallenged. Mr. Voss's only response was to await recross when he asked if Ms. Morris had been threatened with perjury charges, which she had. (Tr. at 339). In fact, Mr. Voss pointed out that Ms. Morris on redirect simply answers yes to every question of the prosecutor. (Tr. at

339). In point of fact, they were not questions from the prosecutor, but leading statements.

Mr. Walbran also led Linda Jhee in her direct and redirect testimony to diffuse her prior descriptions of Cap. (Tr. at 402). He also leads Ms. Jhee in her identification of Mr. Smith as Damon Pitts. (Tr. at 401-402). In fact, it appears Ms. Jhee was actually fed information prior to trial that the prosecutor wanted to hear in her answers, which simply reinforced the leading. The following interaction took place:

"Q. But you did say you knew him as DaMon, and possibly Pitts, right?
A. Yes.
Q. Do you know that Pitts is his mother's name?
A. I was informed by you.
Q. Okay. You had not heard it from him?
A. No."
(Tr. at 401-402).

And on and on it goes, with leading questions from start to finish.

For his part, Mr. Voss only objected 8 times to leading questions during trial. (Tr. at 231, 295, 477, 483, 748, 753, 754). Of those objections, three were properly overruled as foundational questions, or questions under Rule 611 that were intended to develop testimony. (Tr. at 295, 477, 753). The rest of the record is replete with instances of the prosecution leading witnesses, and yet there is not a peep out of Mr. Voss. Mr. Voss allowed the prosecutor to simply present his case

through prosecutorial testimony with witness verification. Mr. Voss failed to meet up to the professional standards and Mr. Smith was seriously prejudiced as a result.

**8. Counsel was ineffective in not properly ensuring that verdict forms stated whether or not the jury found the Defendant had used a firearm in the course of the conspiracy.**

The trial court enhanced the Petitioner's sentence on the basis of a finding that the Petitioner had used a firearm in the course of the conspiracy. The jury was not specifically requested to consider this issue. Judicial fact finding on this issue directly conflicted with the dictates of *Blakely v. Washington*, 124 S.Ct. 2531 (2004), which was decided on June 24, 2004.

Counsel did was ineffective in not ensuring that the issue of whether a gun was used in the course of the conspiracy was submitted to the jury. When current counsel took this case at sentencing, he did so without the benefit of having sat through the trial and without the benefit of the transcript. Mr. Voss should have ensured that verdict forms supplied by the court were clear on the issue of whether the jury found the Defendant had used a firearm in the course of the conspiracy. Failure to do so opened up the issue to the court, which enhanced the sentence.

**9. Counsel was ineffective when he did not ensure that the jury was required to be concise in its verdict by determining what type of cocaine was involved in the case and the exact quantity and for failing to make a motion to partially dismiss where his failure led to seriously enhanced penalties for the Defendant.**

Counsel was also ineffective for failing to make a motion to partially dismiss the indictment because the Government had not proven that the drug in question was smokable crack as opposed to simply cocaine. *See U.S.A. v. Brisbane*, 367 F.3d 910 (D.C. Cir. 2004) (finding that cocaine base means smokable crack and that the conviction for distribution of cocaine base could not stand because the Government had not proven the cocaine base was smokable). The difference is great when it comes to the Petitioner's sentence. Unlike the D.C. Circuit, other circuits have decided that cocaine base includes all forms of cocaine. *United States v. Barbosa*, 271 F.3d 438, 461-467 (3rd Cir. 2001); *United States v. Butler*, 988 F.2d 537, 542-543 (5th Cir. 1993); *United States v. Jackson*, 968 F.2d 158, 161-163 (2d Cir. 1992); *United States v. Easter*, 981 F.2d 1549, 1558 (10th Cir. 1992). In terms of the sentencing guidelines, the Defendant faced tremendous increases in his sentence as a result of his counsel's failure to clarify the type of drug involved.

Additionally, in Mr. Smith's case, Count 1 charged the Defendant with conspiracy to distribute and to possess with intent to distribute in excess of 50 grams of a mixture and substance containing crack cocaine or cocaine base and in excess of 5 kilograms of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 18

U.S.C. § 3237. Count two of the indictment charged the Defendant with attempt to possess with intent to distribute in excess of 500 grams of a mixture and substance containing detectable amounts of crack cocaine, a form of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 18 U.S.C. §§ 2 and 3237. The Indictment tagged on the allegation that 1,912 grams of crack cocaine were involved.

As part of the process of defining the jury's findings, the jury was provided with verdict forms and also interrogatories. (Doc. 86). The jury found in Count 1 that the Defendant's crime involved: ". . . 50 grams or more of a mixture and substance containing a detectable amount of crack cocaine." (Doc. 86). The jury also found that the Defendant's crime involved 500 grams and less than 5 kilograms of a mixture or substance containing a detectable amount of cocaine. (Doc. 86). Interrogatory 2 dealt with Count 2. The jury determined that the Defendant's crime involved 10 grams or more of a mixture or substance containing a detectable amount of crack cocaine. (Doc. 86).

Despite these determinations provided to the Court by the jury, the Presentence Investigation report stated that the Defendant's actions involved 1,912 grams of crack cocaine. The Court adopted this conclusion from the Presentence Investigation report. If the jury had specifically found that 1,912 grams were

involved then the Defendant would have no issue, but his Counsel, Barry Voss, should have ensured the jury was properly presented with the demand that they make such a specific finding. Failure to do that greatly harmed the Defendant and his sentence was greatly enhanced. In this case the jury definitely found guilt involving at least 50 grams of crack cocaine. The jury never provided any definitive number above that. Sentences in drug cases are based on drug amounts. Thus, it is crucial to accurately state the amount involved in a conviction because the sentence increases depending on the amount of drug involved. The Court sentenced the Defendant based on a Presentence Investigation report that stated the amount of drugs involved was 1.9 kilograms.

**10. Counsel was ineffective in failing to address Mr. Smith's other convictions in anticipation of a conviction where such convictions led to a higher criminal history score.**

Mr. Smith has recently succeeded in reducing one of his California convictions to a misdemeanor from a felony. Mr. Voss was ineffective in addressing the entirety of Mr. Smith's case and addressing convictions that he had that could well impact his sentencing. By the time the case reached its conclusion with a jury verdict, precious time had been wasted in addressing this issue. Mr. Smith himself has succeeded in reducing his conviction under Section 261.5 of the California Penal Code to a misdemeanor. He also has other actions pending that

deal with other convictions. Counsel should have planned and addressed this before there was a problem at the sentencing phase. Addressing these convictions would also have allowed the Defendant to be properly advised in any plea negotiations. Failure to address the convictions caused the Defendant great disadvantage in examining his options and possible time he could end up serving. This is one aspect of evidence the Defendant would seek to supplement the record with.

**11. Defense Counsel's Unprofessional Errors Were Prejudicial To Petitioner's Defense And So Were Not Harmless.**

The failure to present available, exculpatory and material evidence can constitute ineffective assistance of counsel. A failure to file a motion in limine that would have kept highly damaging evidence out of the trial can also constitute ineffective assistance of counsel. The same is true of the failure to challenge the government's repeated impermissible use of leading questions on direct examination. The Government has presented no evidence or argument that these failures were tactically or strategically motivated. *Strickland v. Washington*, 466 U.S. at 694. In *Kyles* and in *Fretwell*, the Court mandated an inquiry, which goes beyond possible outcomes. The *Strickland* inquiry is not limited to whether the outcome would have been different; rather, it asks whether the "result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. at 372. Similarly, in *Kyles*, the Supreme Court emphasized that:

> "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."
> 115 S. Ct at 1566.

Therefore, the Court should focus on "the potential impact that the [unused] evidence might have had on the fairness of the proceedings" rather than on the strength of the prosecution's case. *United States v. Cuffie*, 80 F3d 514, 517 (D.C.Cir. 1996). The materiality of undisclosed exculpatory evidence is evaluated

cumulatively. *Kyles*, 115 S. Ct. at 1565. There is no reason to evaluate the prejudice flowing from ineffective assistance of counsel less comprehensively. Here the Defendant's counsel simply abandoned his responsibility to investigate and turned to his cross-examination skills to save the day. Furthermore, counsel completely failed to challenge the government's impermissible use of leading questions on direct examination. That is not enough. The confidence in this verdict should be low, and the Defendant should be granted a new trial.

**<u>CONCLUSION</u>**

For the reasons stated above, Mr. Smith respectfully requests that this Honorable Court overturn his conviction, and grant him a new trial.

Respectfully submitted,



______________________________

David J. Chapman, Esq.
Attorney for Appellant
118 Broadway, Suite 806
Fargo, ND 58102
(701) 232-5899
(701) 232-6470 fax
(MN Attny # 0283897)

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief meets the type and volume limitations of Local Rule 7.1 (c). This brief was prepared with Microsoft Word, in Times New Roman 14-point type and using the Word Count function the brief is determined to contain 11,046 words.

_________________________
David J. Chapman, Esq.
Attorney for Appellant

**CERTIFICATE OF SERVICE**

I certify that on February 28, 2007, I caused the following documents:

MEMORANDUM IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 USC §2255

to be filed electronically with the Clerk of Court through ECF, and ECF will send an e-notice of the electronic filing to the following:

James E Lackner james.lackner@usdoj.gov, myra.fishman@usdoj.gov; usamn.ecfcriminal@usdoj.gov

Dated this 27th day of February 2007.

__________________________
David J. Chapman, Esq.
Attorney for Appellant